```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MARYLAND


SANDRA DENISE ERVIN              *
                                 *
v.                               *   Civil Action No. WMN-15-201
                                 *
NATIONAL UNION FIRE INSURANCE    *
COMPANY OF PITTSBURGH, PA.       *

    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *
```

## **MEMORANDUM**

Before the Court are cross motions for summary judgment filed by Plaintiff Sandra Denise Ervin, ECF No. 29; and by Defendant National Union Fire Insurance Company of Pittsburgh, PA. (National Union). ECF No. 33. The motions are fully briefed. Upon review of the motions, the administrative record, and the applicable case law, the Court determines that no hearing is necessary, Local Rule 105.6, and that Plaintiff's motion will be denied and Defendant's motion will be granted.

On April 18, 2014, Frederick Ervin, Jr. was boating on the Severn River when he became ill, leaned over the side of the boat to vomit, fell into the river, and subsequently died. At the time of his death, Mr. Ervin was insured, through his employer, under an accidental death and dismemberment policy issued by Defendant National Union (the Policy). Plaintiff Sandra Ervin, Mr. Ervin's widow and beneficiary, made a claim for accidental death benefits under the Policy, which Defendant

subsequently denied, both initially and after an appeal. Plaintiff then filed suit in the Circuit Court for Anne Arundel County challenging that denial. Defendant timely removed the action to this Court, noting that, because the insurance contract at issue falls under the provisions of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq., this Court has original jurisdiction over this action under 29 U.S.C. § 1132(a)(1)(B).

When reviewing a denial of benefits under an ERISA-governed plan, a District Court must first determine "whether the relevant plan documents confer discretionary authority on the plan administrator." DuPerry v. Life Ins. Co. of N. Am., 632 F.3d 860, 869 (4th Cir. 2011). Unless the benefit plan gives the administrator that discretion, a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Furthermore, in conducting that de novo review, the District Court is generally limited to looking only at the evidence that was before the plan administrator when the benefits determination was made. Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1025 (4th Cir. 1993). Here, the parties agree that this Court's review is de novo and should be limited, at least at the summary judgment stage, to a review of

the administrative record.  See Pl.'s Mem. at 6,[1] ECF No. 29-1; Def.'s Mem. at 9, ECF No. 33-1.  Defendant has filed the complete Administrative Record (A.R.) with the Court.  See ECF No. 19.

It is also undisputed that, in an ERISA case, the insured has the initial burden of demonstrating that a claim falls within the scope of coverage under the insurance policy at issue but, once the insured has satisfied that initial burden, the insurer has the burden of proving the applicability of any exclusion.  Ferguson v. United of Omaha Life Ins. Co., 3 F. Supp. 3d 474, 481 (D. Md. 2014).  Here, the Policy provides coverage for an accidental death benefit "[i]f Injury to the Insured Person results in death within 365 days of the date of the accident that caused the Injury."  A.R. at 43.  "Injury" is defined as "bodily injury (1) which is sustained as a direct result of an unintended, unanticipated accident that occurs while the injured person's coverage under the Policy is in

---

[1] Perhaps due to some confusion as to what was required under the Court's Scheduling Order, as amended, ECF No. 15, Plaintiff served a Rule 26(A)(2) expert disclosure, which Defendant then moved to strike on the ground that the Court's review was limited to the Administrative Record.  ECF No. 28.  Plaintiff responded to the Motion to Strike, acknowledging that, while the Administrative Record might be sufficient for the Court to issue a ruling on the summary judgment motions, should the case proceed to trial, expert testimony might be necessary.  ECF No. 30 at 3.  As this case clearly is one that can be decided on summary judgment, the Court will deny Defendant's Motion to Strike as moot.

force, and (2) which directly (independent of sickness, disease or any other cause) causes a covered loss." A.R. at 68.

The Policy also includes a list of exclusions.  Under those exclusions, "[n]o coverage shall be provided under this Policy and no payment shall be made for any loss resulting in whole or in part from, or contributed to by, or as a natural and probable consequence of any of the following excluded risks <u>even if the proximate or precipitating cause of the loss is an accidental bodily injury</u>."  A.R. at 68 (emphasis added).  Those excluded risks include, <u>inter alia</u>,

> 2. sickness, disease, mental incapacity or bodily infirmity whether the loss results directly or indirectly from any of these.
> . . .
> 7. the Insured Person being under the influence of intoxicants while operating any vehicle or means of transportation or conveyance.
> . . .
> 11. stroke or cerebrovascular accident or event; cardiovascular accident or event; myocardial infarction or heart attack; coronary thrombosis; aneurysm.

<u>Id.</u> at 68-69.

Defendant's reason for denying coverage has shifted somewhat over time.  In the initial letter denying Plaintiff's claim, Defendant focused on Exclusion #2, concluding that "[t]here is no indication that Frederick Ervine Jr's death was the direct result of an accidental Injury" in that his death "was the result of Atherosclerotic Cardiovascular Disease; or

sickness, disease, or bodily infirmity which is specifically excluded under the policy." A.R. at 149.  In the letter denying Plaintiff's appeal of that initial decision, Defendant cited, in addition to Exclusion #2, Exclusion #7 and referenced a toxicology report regarding Mr. Ervin's blood alcohol level. A.R. at 241.  In its summary judgment briefing, Defendant argues first that Plaintiff's claim does not fall within the scope of coverage under the Policy because Mr. Ervin did not suffer an accidental injury as defined in the Policy.  In the alternative, Defendant argues that the claim is excluded under Exclusions #2, #7 and #11.  For the reasons that follow, the Court concludes that coverage was properly excluded under Exclusion #2.[2]

There is basic agreement as to Mr. Ervin's general health at the time and the circumstances surrounding his passing.  Mr. Ervin was 56 years old, was medically obese, a Type II diabetic, and had been a pack-a-day cigarette smoker for forty years until he quit just four months earlier.  He also had a history of

---

[2] The Court will assume, without deciding, that Plaintiff can meet her burden of establishing that Mr. Ervin's death falls within the scope of coverage under the Policy, i.e., that he suffered an accidental death.  The Court also need not decide whether Defendant's recent invocation of Exclusion #11 has merit, although it is certainly implicated in that it excludes coverage for losses contributed to by "cerebrovascular accident or event; cardiovascular accident or event; myocardial infarction or heart attack."  As for Exclusion #7, relating to intoxication, the Court also need not reach its applicability. The Court notes, however, that there is nothing in the record to indicate that Mr. Ervin's alcohol intake contributed in any way to his death.

heart disease and underwent a cardiac catherization and left ventriculography in December of 2013.  Although Plaintiff points to evidence in the Administrative Record that could be read as minimizing the seriousness of Mr. Ervin's heart condition, there is no dispute that he had a heart attack of some severity before falling in the water.  The report on the autopsy conducted by Assistant Medical Examiner Dr. J. Laron Locke concluded that Mr. Ervin "died of Atherosclerotic Cardiovascular Disease complicated by Drowning" and Dr. Locke opined that "[i]t appears he had a 'heart attack' before entering the water."  Post Mortem Examination Report, A.R. at 7.

On the day in question, Mr. Ervin was out on his motorboat with a friend, Howard Lehnert.  They both had been consuming alcohol and the autopsy report indicated that Mr. Ervin had a blood alcohol level significantly above the legal limit.  In recounting to the Maryland Natural Resource Police (MNRP) what had happened, Mr. Lehnert stated that Mr. Ervin became sick while operating the boat and went to the side of the boat to throw up and did so.  While leaning over the side, Mr. Ervin fell out of the boat and landed in the water, face down.  Mr. Lehnert reported that Mr. Ervin "was not moving or attempting to get back in on his own."  MNRP Incident Report, A.R. at 10.  With the help of two men on a nearby dock, Mr. Lehnert was able

6

to lift Mr. Ervin back into the boat but he "was still not moving or coughing." Id. at 9-10.

Defendant interprets Mr. Lehnert's recounting of events in two different and conflicting ways. In its Reply brief, Defendant suggests that Mr. Lehnert's testimony concerning Mr. Ervin's lack of movement or struggle once in the water corroborates "the fact that Mr. Ervin had died from a heart attack by the time he fell into the water." ECF No. 37 at 7 (emphasis added). A few pages later, however, Defendant suggests that "the only 'logical' explanation" for his failure to struggle or call out "is that Mr. Ervin was unconscious (and therefore unable to swim, struggle, call for help) either because of a heart attack or because of his intoxicated state." Id. at 11 (emphasis added). From its review of the Administrative Record, the Court concludes that Mr. Ervin was unconscious but was still alive when he entered the water.

While the first cause of death Dr. Locke listed in the autopsy report was "Atherosclerotic Cardiovascular Disease: A. Coronary artery disease, moderate - severe; B. Cardiomegaly; C. Concentric left ventricular hypertrophy," he listed "Drowning" as the second cause of death. A.R. at 7.[3] In addition, the autopsy report indicates that there were "moderate amounts of

---

[3] Dr. Locke also listed "Morbid Obesity" as the third cause of death. Id.

7

frothy blood-tinged fluid" in Mr. Ervin's lungs. Id. at 5. While Defendant correctly observes that there is no medical authority in the Administrative Record connecting that fact to the conclusion that Mr. Ervin was still breathing after his fall, that he was still breathing would seem to be a logical explanation for the fluid in his lungs. Regardless, had Dr. Locke concluded that Mr. Ervin died before hitting the water, his report would not have listed drowning as one of the causes of death nor would he have indicated that the coronary event was "complicated by Drowning." As noted by Plaintiff, the Medical Examiner's Report also determined "[t]he manner of death is ACCIDENT," A.R. at 7, which is consistent with the conclusion that he had drowned.

Based upon the classification of the manner of Mr. Ervin's death as accidental, Plaintiff submitted her claim to Defendant for accidental death benefits. In response to that claim, Defendant sought an independent review from Dr. Andrew Baker, a forensic pathologist. After reviewing Mr. Ervin's medical history, the MNRP Report, and the Medical Examiner's Report, Dr. Baker stated that the "sequence of events would be entirely consistent with an acute cardiac event (which can present as vomiting), followed by the onset of unconsciousness due to a cardiac arrhythmia from the heart disease." A.R. at 131. As to the manner of death, Dr. Baker opined that "[b]y convention,

8

since Mr. Ervin collapsed into a body of water, many medical examiners would regard the environment as another factor, and therefore regard the death as an accident." Id. He concluded

> But for the cardiac disease Mr. Ervin had, there is no reason he would have fallen into the water with no apparent effort to extricate himself, or even move. Mr. Ervin's death was not directly independent of sickness, disease or bodily infirmity, since it was his underlying cardiac disease that started the unfortunate chain of events on 4/18/14 that led to his death.

Id.

There is a well-established line of decisions, including a recent decision of this Court, Ferguson, supra, in which courts have held that accidental death benefits are payable where a disease or preexisting condition causes an accident that, in turn, causes a death despite policy exclusions for losses caused by sickness or illness. In one of the most often cited decisions in this line, Kellogg v. Metropolitan Life Insurance Company, 549 F.3d 818 (2008), the insured had a seizure while driving which caused him to crash into a tree and he suffered a fatal skull fracture as a result of that crash. In concluding that there was coverage under his accidental death policy, the Tenth Circuit stated,

> [h]ere the loss ([the insured]'s death) was caused by a skull fracture resulting from the car accident, not by physical or mental illness. While the seizure may have been the cause of the crash, it was not the cause of Brad Kellogg's death. The Plan does not contain

9

> exclusion for losses due to accidents that were caused
> by physical illness, but rather excludes only losses
> caused by physical illness.  Because there is no
> evidence that the seizure caused [the insured]'s
> death, [the insurer]'s argument fails.

549 F.3d at 832.

Several of the decisions cited and relied upon in Kellogg involved drownings.  For example, in National Life & Accident Insurance Co. v. Franklin, 506 S.W.2d 765 (Tex. App. 1974), the insured, who had a history of epileptic seizures, was believed to have had a seizure which caused him to fall into a bathtub and drown.  The court held that benefits were payable under a policy that provided coverage if a death results "from bodily injuries effected solely through external, violent and accidental means . . . provided [] that no such death benefit shall be payable if death results from or is contributed to by any disease or mental infirmity, or medical or surgical treatment thereof."  Interpreting that language, the court reasoned that his epilepsy was not the cause of his death, but was "merely a cause of a cause and was therefore too remote to bar recovery."  Id. at 767.

In Orman v. Prudential Insurance Co., 296 N.W.2d 380 (Minn. 1980), the insured lost consciousness due to the bursting of a cerebral aneurysm and fell into the bathtub and drowned.  While the policy excluded losses "caused or contributed to by bodily

infirmity or disease," the court concluded that there was coverage on the ground that,

> [i]t was a mere fortuity that the decedent stood over a bathtub full of water at the time the aneurysm burst and rendered her unconscious.  In other words, the aneurysm may have contributed to the accident, but it did not contribute to the death.  In such circumstances, the aneurysm is simply too remote to be deemed a direct or contributing cause of death.

Id. at 382.

In Manufacturers' Accident Indemnity Co. v. Dorgan, 58 F. 945 (6th Cir. 1893), the court held that there was coverage under an accidental death policy where it was believed that the insured fell into a creek after suffering dizziness due to a preexisting heart disease.  The court reasoned that:

> [I]f the deceased suffered death by drowning, no matter what was the cause of his falling into the water, whether disease or a slipping, the drowning, in such case, would be the proximate and sole cause of the disability or death, unless it appeared that death would have been the result, even had there been no water at hand to fall into.  The disease would be but the condition; the drowning would be the moving, sole, and proximate cause.

Id. at 954.

Relying on this line of decisions, Plaintiff argues that, because there is no evidence that Mr. Ervin would have died of the heart attack had he experienced it on dry land, the exclusion does not apply to her claim.  The heart attack may have caused the drowning, but there is no evidence that it

11

caused the death.  On that factual question, the Court would agree.  Plaintiff's cardiologist, Anees Ahsan, noted that Mr. Ervin had "non-critical coronary artery disease" and opined that, "[h]ad he been on the ground with a similar clinical presentation, the outcome of this tragedy might have been very different."  A.R. at 203.[4]  Dr. Baker's conclusion that the heart attack was the start of an "unfortunate series of events" is entirely consistent with the conclusion that the heart attack caused the drowning, and the drowning caused the death.

While agreeing for the most part with the factual conclusions advanced by Plaintiff, the Court, applying the actual language contained in the Policy, nonetheless concludes that the recovery is excluded under Exclusion #2.  While the courts in Kellogg, Franklin, Orman and Dorgan may have held that the language of the policy exclusions at issue before them did not encompass preexisting conditions or sickness that caused accidents that, in turn, caused death, the court in Kellogg specifically allowed that the insurer "could have drafted the policy to exclude losses resulting from accidents caused by injury or illness."  549 F.3d at 832 n.5.  The Kellogg court cited as an example of such language an exclusion examined by

---

[4] Defendant points out that this opinion may have been based upon Dr. Ahsan's belief that Mr. Ervin did not know how to swim, a belief that may or may not be accurate.

12

the Fifth Circuit in Sekel v. Aetna Life Ins. Co., 704 F.2d 1335, 1336-37 (5th Cir. 1983).

In Sekel, the policy provided that "no payment shall be made for any loss resulting from any injury caused or contributed to by, or as a consequence of, any of the following excluded risks, even though the proximate or precipitating cause of loss is accidental bodily injury." Id. at 1336-37. The excluded risks included "bodily or mental infirmity" and "disease." The insured in Sekel had a cardiovascular disease that caused him to pass out and fall and, when he fell, he hit his head and died of a skull fracture. The Fifth Circuit held that coverage was excluded, concluding that the "purpose of this clause was to bar recovery in cases where the insured's death was caused or contributed to by or a consequence of a noncovered risk such as disease, even though an accidental injury was the proximate and precipitating cause of death so that, accordingly, the causal, contributory or consequential relationship between the disease and death was not proximate." Id. at 1343-44.

Following the dictate that the plain language of an insurance policy must be given effect, the court found that the "even though" language in the exclusion compelled this conclusion: "a loss, a functionally closely related significant cause or contributing factor of which is a noncovered risk, is excluded from the policy's accidental death benefits even though

13

a covered risk is the proximate and more immediately precipitating cause of the loss.  The exclusion clause is clear and unambiguous in conveying this meaning." Id. at 1338.

The exclusionary language in the National Union Policy at issue here is nearly identical to the language in the Sekel policy and clearly compels the same result.[5]  The Policy provides that coverage is excluded where a noncovered risk (in this case, heart disease) contributed to the death "even if" a covered risk (in this case, an accidental drowning) is the proximate and more immediately precipitating cause.  While Mr. Ervin may not have died had he had the heart attack on land, there is no genuine dispute that the heart attack contributed to his death in an immediate and significant manner.  Dr. Baker, the independent forensic examiner retained by Defendant concluded, "[b]ut for the cardiac disease Mr. Ervin had, there is no reason he would have fallen into the water."  A.R. at 131. He also concluded that it was "his underlying cardiac disease that started the unfortunate chain of events."  Id.

Finding that there is no genuine dispute as to the facts that are material to the applicability of this exclusion and that, under those facts, this exclusion is clearly applicable,

---

[5] In its cross-motion, Defendant specifically observes the similarity of the language in the Policy and the language interpreted and applied in Sekel.  In her opposition to that motion, Plaintiff makes no response to that observation.

14

the Court must grant summary judgment in favor of Defendant. See Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  A separate order will issue.


                               _____/s/_____
                               William M. Nickerson
                               Senior United States District Judge


DATED: September 21, 2015